JUDGE B. LYNN WINMILL

Thomas T. Bassett, ISB #8092
Email: tom.bassett@klgates.com
Gregory F. Wesner, *Pro Hac Vice*
Email: gregory.wesner@klgates.com
Kjirstin J. Graham, *Pro Hac Vice*
Email: kjirstin.graham@klgates.com
K&L GATES LLP
618 West Riverside Avenue, Suite 300
Spokane, WA 99201-0602
Telephone: (509) 624-2100
Facsimile: (509) 456-0146

Attorneys for Plaintiff
Vista Engineering Technologies, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| VISTA ENGINEERING TECHNOLOGIES, LLC, a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> PREMIER TECHNOLOGY, INC., an Idaho corporation, <br><br> Defendant. | No. 4:09-CV-00008-BLW/CWD <br><br> REPLY IN SUPPORT OF VISTA'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

Vista Engineering Technologies, LLC ("Vista") hereby submits its reply in support of its Motion for Partial Summary Judgment as follows:

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

II.   LEGAL ARGUMENT ............................................................................................ 3

A.  Premier Has Admitted that Its Only Basis for Believing that Vista did Not Meet the Contract Specifications is MOX's Failure to "Approve" Vista's Work. ................................................................................................. 3

B.  As a Matter of Law, Premier Did Not Have a Contractual Right to Withhold Payment Based on Lack of MOX Approval. ..................................... 3

1.  The Contract Documents Provide No Such Right. ..................................... 3

2.  Other Contract Terms Cited by Premier Do Not Provide that Payment is Conditioned on MOX "Approval." ........................................... 4

3.  When Viewing the Contract as a Whole, Additional Provisions Aid in the Determination that There is No MOX Approval Condition of Payment. ................................................................................. 6

4.  The Contract Does Not Condition Payment on Vista's Incorporation or Disposition of All MOX Comments. ............................... 7

5.  Under Idaho Law, Premier Cannot Withhold Payment Based on MOX Comments Outside the Contract Scope. ........................................... 8

6.  The Contract Documents Must be Construed Against a MOX Approval Requirement. ............................................................................ 10

a.  Premier's interpretation of MOX contract terms conflicts with that of its Rule 30(b)(6) witness. ............................................. 10

b.  The parties' conduct shows that Premier did not believe it had any right to condition payment on MOX "approval." ................ 10

i.   Premier paid 31 Vista invoices without reservation. ............... 100

ii.  After MOX de-scoped the slab tank work from Premier's contract, Premier agreed to pay Vista for Vista's slab tank work done to that point .................................. 11

iii. Premier cancelled the Contract without cause and at the same time promised to pay Vista for its work to date. .................................................................................... 11

c.  Premier never availed itself of the Contract's specific mechanism for addressing any alleged non-performance by Vista. ........................................................................................ 12

d.  Nothing in Vista's conduct reflects an acknowledgement that Vista was not entitled to be paid due to lack of MOX "approval." .................................................................................. 12

7.  Even if MOX or Premier Never "Approved" Vista's Work, Premier Cannot Rely on the Non-Approval Because Premier

Has Not Identified Any Reasonable Basis for the Failure to Approve – As Required by Idaho Law. ...................................................... 16

8.   Even if there is a MOX Approval Requirement and MOX Failed to Approve Vista's Work, Premier Waived its Right to Assert That As a Condition of Payment. ............................................................ 18

9.   Contract Terms Cited by Premier are Unavailing. ..................................... 19

    a.   The no-waiver provision does not help Premier. .............................. 19

    b.   The inspection provision does not help Premier. .............................. 19

10.   As a Matter of Law, Premier Accepted Vista's Work. ............................... 20

    a.   Premier never rejected Vista's work. ................................................. 20

    b.   Premier made payments on and agreed to pay for work that Premier now claims is "unacceptable." ............................................ 22

11.   Premier is Estopped to Assert Lack of MOX Approval As a Basis Not to Pay Vista. .............................................................................. 22

12.   Premier Prevented Vista From Completing the Comment Review Process and Obtaining MOX "Approval." ..................................... 24

C.   As a Matter of Law, Premier Cannot Deny Payment to Vista on the Basis that Vista Violated the Engineering Standard of Care. .......................... 27

1.   It is the Opinion of Vista's Expert, Roger Reedy that Vista's Engineering Work was "State of the Art." .................................................. 27

2.   Premier Has Not Supplied Any Material Evidence to Suggest that Vista Violated the Engineering Standard of Care. .............................. 27

3.   Premier's Opportunity to Complain About the Quality of Vista's Work Has Long Since Past. ........................................................................ 28

4.   Premier's Own Expert and Witness Admit that Vista's Work Met the Contract Specifications and Engineering Standard of Care. ............................................................................................................ 29

    a.   Premier does not dispute that its own expert concluded that Vista qualified Slab Tank 8000, met the contract specifications and engineering standard of care. ............................... 29

    b.   Premier does not dispute that its replacement subcontractor, M&D, concluded that Vista's engineering work qualified the annular tanks, met the contract specifications and the engineering standard of care. ............................................................ 30

D.   Premier Does Not Dispute That Its Auditors Verified the Accuracy of Over $1.4 million in Charges on Vista Invoices 32-35. ..................................... 30

III.   CONCLUSION. ................................................................................................ 31

The following citations will be used in this Reply brief:

- Vista's Memorandum in Support of its Motion for Partial Summary Judgment (Doc. 100) is hereinafter "Vista MSJ."
- Premier's Response to Vista's MSJ (Do. 120) is hereinafter "Premier Resp. Br."
- Vista's Separate Statement of Undisputed Facts in Support of Vista's MSJ (Do. 99) is hereinafter "Vista MSJ SOF, Nos. ___."
- Vista's Separate Statement of Facts in Response to Premier's MSJ (Doc. 113) is hereinafter "Vista Resp. SOF, Nos. ___."
- Premier's Statement of Facts in Response to Vista's MSJ (Doc. 121) is hereinafter "Premier Resp. Fact., Nos. ___."
- Declaration of Phillip Ohl in Support of Vista's MSJ (Doc. 94) is hereinafter "Ohl MSJ Dec."
- Declaration of Phillip Ohl in Response to Premier's MSJ (Doc. 114) is hereinafter "Ohl Resp. Dec."
- Declaration of Phillip Ohl in Reply to Premier's Response to Vista's MSJ is hereinafter "Ohl Reply Dec."

# TABLE OF AUTHORITIES

Page

## CASES

*Amato v. United States,*
94 F. Supp. 2d 1077 (D. Idaho 1999) .................................................................. 20

*APAC Carolina, Inc. v. Town of Allendale, South Carolina*
41 F3.d 157 (4th Cir. 1994) .............................................................................. 20

*C&G, Inc. v. Canyon Highway Dist. No. 4,*
439 Idaho 140 (2003)........................................................................................ 23

*Capobianco v. City of New York,*
422 F.3d 47 (2d Cir. 2005) ............................................................................... 29

*Cheney v. Jemmett,*
107 Idaho 829 (1984)................................................................................... 16, 17

*FTC v. Publ'g Clearing House, Inc.,*
104 F.3d 1168 (9th Cir. 1997) ............................................................................ 2

*Grover v. Wadsworth,*
147 Idaho 60 (2009)......................................................................................... 23

*Jacobsen v. Katzer,*
2009 WL 4823021, (N.D. Cal. 2009) ................................................................ 27

*Meredith Corp. v. Design & Lithography Center, Inc.,*
101 Idaho 391 (1980)........................................................................................ 17

*Navarrete v. City of Caldwell,*
130 Idaho 849 (Idaho Ct. App. 1997)................................................................... 8

*Olson v. Quality-Pak Co.,*
93 Idaho 607 (1970).......................................................................................... 18

*Prince v. Elm Investment Co.,*
649 P.2d 820 (Utah 1982)................................................................................. 17

*Puget Sound Nat. Bank of Tacoma v. C. B. Lauch Const. Co.,*
73 Idaho 68 (1952)................................................................................... 9, 10, 16

*Quality Resource Servs., Inc. v. Idaho Power Co.,*
No. 08-145, 2010 WL 679018 (D. Idaho, Feb. 23, 2010) ................................... 10

*Sullivan v. Bullock,*
124 Idaho 738 (Ct. App. 1993)......................................................................... 26

*Tentinger v. McPheters,*
132 Idaho 620 (1999)........................................................................................ 18

*United States v. Jensen,*
608 F.2d 1349 (10th Cir. 1979) .......................................................................... 6

*Vogt v. Madden,*
110 Idaho 6 (Ct. App. 1985)............................................................................. 20

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,*
  803 F.2d 454 (9th Cir. 1986) .............................................................................................. 6

**RULES**

Fed. R. Civ. P. 56............................................................................................................... 19

Fed. R. Civ. P. 56(d) .................................................................................................... 30, 31

Fed. R. Civ. P. 30(b)(6) ............................................................................................. passim

**OTHER AUTHORITIES**

13 *Williston on Contracts* § 38:25 (4th ed.) ......................................................................... 16

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Premier's motion for summary judgment ("MSJ") and response brief are based entirely on the premise that the Contract specifications required Vista to obtain MOX's approval.[1]  Premier also makes MOX the final and only determiner of whether Vista met the "standard of care."  As MOX never approved Vista's work, Premier argues, Vista is not entitled to be paid under the Contract.  This argument fails first, because none of the Contract provisions cited by Premier conditions payment to Vista on MOX approval.  Premier's Contract interpretation directly conflicts with the interpretation given by its own Rule 30(b)(6) witness that, in the "approval" terms cited by Premier, any reference to MOX is excluded and the terms apply solely between Premier and Vista.

Even if payment *was* conditioned on MOX's approval and MOX never approved Vista's work, Premier's case still fails as a matter of law.  Idaho law requires that there be a *reasonable, objective basis* for the alleged lack of approval to justify Premier's refusal to pay.  *See* Section II(B)(7) *infra*.  Premier has no response to Vista's qualified expert witness opinions that Vista's work was state of the art and met the Contract specifications other than bald and insufficient assertions that Vista's work was never "approved" by MOX.  Premier has yet to present this Court with a shred of evidence identifying any errors or deficiencies in Vista's 28 P.E. stamped engineering reports; nor has Premier identified *any* calculation or analysis that Vista did not perform as required by the Contract specifications.

Premier also claims that Vista was not entitled to be paid *at all* until Vista "dispositioned" or incorporated all of MOX's comments.  The Purchase Order expressly provides, however, that Vista's initial contract price did not include comment incorporation outside the Contract scope.  Premier repeatedly admitted that the MOX "comments" were, in fact, demands by MOX for engineering analysis outside the Contract scope and multiple

---

- [1] *See* Table of Contents for format of citations to the evidence.

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 1

MOX design changes that required reanalysis by Vista – actions by MOX that resulted in the schedule delays and cost overruns for which Premier now blames Vista.

Premier's position is also absurd: So long as MOX's requests for extra analysis and design changes are characterized as "comments," Vista's work scope under the Contract was virtually unlimited because, according to Premier, the Contract required Vista to do whatever MOX demanded via its "comments." MOX could withhold its "approval" indefinitely (and for any reason, as Premier has failed to identify any basis for MOX's alleged failure to approve) with no payment ever being owed to Vista. But that is not the deal Premier made with Vista. Vista agreed to see the project through to "completion" when MOX settled on final tank designs that passed ASME Code, but not without payment for the extra work. Premier authorized Vista to bill for MOX comment incorporation on a time and materials basis. Whether termed time & materials or "progress" payments toward the resolution of MOX's insatiable demands for extra work, the undisputed fact remains that Premier agreed to pay Vista for this extra work. Premier issued Purchase Order revisions, including Revision 14 on which Premier has yet to pay. Also, in its letter of cancellation, which Premier admitted was "without cause," Premier promised that Vista "shall be paid" for charges "that have resulted from work performed prior to the cancellation."

Premier's conclusory assertions are insufficient to create an issue of fact for trial. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (issues of fact sufficient to defeat summary judgment must be "genuine;" mere assertions which lack evidentiary support cannot preclude summary judgment). Summary judgment on liability should be entered in Vista's favor on its Complaint and Premier's Counterclaim.

Furthermore, Premier does not dispute that its own auditors confirmed the accuracy of over $1.4 million in charges on Vista invoices 32-35, which were issued pursuant to

Revision 14 and Premier's cancellation letter. The Court should adjudicate that Vista's compensatory damages for trial are a minimum $1,433,566.07 million dollars.

## II.   LEGAL ARGUMENT

### A.   Premier Has Admitted that Its Only Basis for Believing that Vista did Not Meet the Contract Specifications is MOX's Failure to "Approve" Vista's Work.

Premier's Rule 30(b)(6) witness admitted that the "sole" basis for Premier's determination that Vista's deliverables did not comply with the contract specifications is the alleged lack of MOX approval. Ohl Resp. Dec., Ex. Z, p. 33:10—p. 34:4. Accordingly, Premier's determination that Vista breached the Contract is limited "solely" to the alleged lack of MOX approval. Premier's breach of contract claim on any other basis (*i.e.* lack of Certificate of Conformance, alleged late deliveries and alleged failure to meet the Contract standard of care) fails for this reason alone. *See* Vista Resp. Br., p. 9.

### B.   As a Matter of Law, Premier Did Not Have a Contractual Right to Withhold Payment Based on Lack of MOX Approval.

#### 1.   The Contract Documents Provide No Such Right.

Premier extracts a "MOX approval" requirement from the Section E Terms & Conditions and MOX specifications, which form a part of the MOX-Premier contract. Premier claims that they are incorporated into Vista's Contract by reference. Premier Resp. Br., pp. 10-19. Premier's Rule 30(b)(6) witness testified to an interpretation of these documents that directly contradicts Premier's contention that Vista was required to obtain MOX's approval. As set forth fully in Vista's response to Premier's MSJ, pp. 6-7, 10-11, Premier's Rule 30(b)(6) witness testified that the MOX contract documents are "flowed down" to Vista's Contract, such that any reference to MOX is to mean Premier and any reference to Premier is to mean Vista. Thus, Premier – not MOX – is the "Authority having jurisdiction" to direct and "approve" Vista's work. Premier cannot avoid its own

Rule 30(b)(6) testimony by now offering a different interpretation of the Contract. *See id.* at p. 7 (citing cases and Vista Resp. SOF, No. 25).

### 2. Other Contract Terms Cited by Premier Do Not Provide that Payment is Conditioned on MOX "Approval."

Premier points to Vista's acknowledgement that MOX would review and comment on Vista's work. It is immaterial that Vista's work was subject to review by MOX. Vista understood that MOX was reviewing and commenting on its work, but, even according to Premier's own interpretation of the Contract, Vista's contractual obligations were to submit its work to Premier – not MOX—for acceptance and payment. Premier has not produced a single document, nor has it identified a single communication, in which Vista agreed that, simply because MOX was reviewing and commenting on its work, Vista could not get paid if MOX failed – for any reason, right or wrong – to approve Vista's work.

Premier also relies on Line 1 of the Purchase Order, which provides that the "submittal *requirements*" in the MOX specifications are to be "met and accepted." Ohl MSJ Dec., Ex. 2 (emphasis added). Vista does not dispute that there were a set of objective requirements in the MOX specifications (*i.e.* the "submittal requirements") that its calculation reports had to meet. Vista Resp. SOF, No. 26. Premier has yet to identify a single calculation or analysis that Vista did not perform as required by those specifications or to identify any error or deficiencies in that work. *See generally* Premier Resp. Br. Nothing in Line 1 requires that Vista's *deliverables* must be "accepted by MOX."

Premier also relies on Line 38 of the Purchase Order, which states that "Vista will provide a complete design report (Input, Basis, Final and Other Analysis) for each vessel (37 Total Vessels). Each set of design documents shall be stamped by a PE licensed in South Carolina." Ohl MSJ Dec., Ex. 2, p. 3. A plain reading of this provision reveals no MOX approval requirement. Vista satisfied Line 38. As Vista's Rule 30(b)(6) witness testified, "final in this context" means "the final report that qualifies the vessel for service stamped by

a P.E. authorized to work in the State of South Carolina." Ohl Reply Dec., Ex. ZZ, p. 94:4—

p. 95:19. Vista submitted 28 P.E. stamped reports qualifying 12 vessels (of varying designs)

that complied with the ASME Code. Vista Resp. SOF, Nos. 14, 52; Ohl MSJ Dec., Ex. B,

pp. 17-20. Analysis on the other 23 slab tanks and 2 annular tanks was stopped in process

by Premier. Vista MSJ SOF, Nos. 42, 46, 53.

 Failing to refute that Vista provided P.E. stamped reports in compliance with

Line 38, Premier next complains that Vista did not submit a Certificate of Conformance ("C

of C"). Premier ignores Vista's Rule 30(b)(6) testimony on this very issue:

> I want to answer correctly for you, what does the Certificate of Conformance
> mean. The Certificate of Conformance means that both the P.E. stamping the
> report and the client are satisfied that there are no more changes. So, when a
> Vista engineer puts a P.E. stamp on a report, you wait until a client is
> satisfied, done, with changes to the vessel, the service, until we can put a
> Certificate of Conformance. The client is changing the design. You can't put
> a Certificate of Conformance on it....When the client tells Vista they wish to
> use another method for calculation, wish to change the way the structure is
> going to be anchored to the facility, that's a change that we can't apply a
> Certificate of Conformance. So, when the client, Premier, changes their mind
> or changes the design, it has to go back and be reanalyzed. It's not
> appropriate to give a Certificate of [Conformance] for a wrong design, a
> design that was changed by the client. Ohl Reply Dec., Ex. ZZ, p. 95:20—
> p. 97:7.

 Accordingly, Vista was to issue a C of C once MOX – through Premier - settled on a

passing design and stopped requesting extra work outside the contract scope. MOX never

did so long as Vista was working on the project. Ohl Reply Dec., ¶ 4. The C of C was a

final step in the project that Premier prevented Vista from performing by cancelling Vista's

Contract before MOX settled on passing designs for the tanks. Vista Resp. SOF, No. 66.

Premier repeatedly acknowledged the design changes and extra work scope. Vista Resp.

SOF, Nos. 10-22. Vista was willing to undertake the extra work dictated by MOX through

Premier and see the project through to "completion," but not without additional payment and

additional time to perform the extra work. Ohl Reply Dec., ¶¶ 3, 6. Premier admits that it

agreed to modify price and schedule under the Contract. Vista MSJ SOF, No. 19-24.

### 3.    When Viewing the Contract as a Whole, Additional Provisions Aid in the Determination that There is No MOX Approval Condition of Payment.

Premier does not dispute that it agreed there is no third-party beneficiary to the Vista-Premier Contract. Nor does it dispute that Premier, not MOX, provided the specifications to Vista and that Vista submitted its work to Premier, not MOX. Premier Resp. Fact, Nos. 12-14. These provisions serve to confirm that Vista provided its work for Premier's benefit and acceptance only.

Contract specifications requiring ASME Code compliance also confirm that Premier, as the ASME Certificate holder for the MOX project, had sole responsibility to determine whether Vista's work properly qualified the tank designs under applicable ASME Code. Vista MSJ SOF, Nos. 3, 4; Ohl MSJ Dec., Ex. B, pp. 5-7.[2]  MOX even denied that it had any such responsibility. In a comment on a Vista calculation, MOX stated, "While this calculation is approved, *it is the responsibility of the vendor to ensure that the appropriate criteria from applicable project specifications and referenced codes are met.*" Ohl Reply Dec., ¶ 10, Ex. YY (emphasis added). Thus, MOX confirmed that it was the responsibility of its "vendor," *i.e.* Premier, - not MOX - to ensure compliance with the Contract specifications.

---

[2] Premier incorrectly asserts that Vista's expert cannot interpret the ASME Code in this manner, because it constitutes a "legal conclusion." Premier Resp. Fact, No. 4. The interpretation of certain industry-regulating rules and regulations is a "proper matter[] of expert testimony." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 461 (9th Cir. 1986) (testimony ruled admissible where expert witness interpreted rules of the National Association of Security Dealers and evaluated party's compliance therewith). Where the evidence is of a highly complex nature, *i.e.* the technical regulations of a specialized industry, as here, expert interpretation of the relevant standards can and should be utilized. *See United States v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979) (interpretation of industry standard is "not an unadorned legal conclusion" and is "properly within the area of an expert's opinion"). Premier offers no expert testimony to refute the fact that it – not MOX – had sole authority to certify whether Vista's work qualified the tank designs under the applicable ASME Code. *See* Premier Resp. Fact, No. 4.

### 4. The Contract Does Not Condition Payment on Vista's Incorporation or Disposition of All MOX Comments.

Premier contends that Vista was not entitled to be paid until Vista "dispositioned" all of MOX's comments on Vista's work. Premier Resp. Br., pp. 11-14, 18. Premier points to Line 1 of the Purchase Order in support. *Id.* at p. 18. Line 1 provides that the "contract price includes any costs associated with incorporating any [Premier] and [MOX] comments *that are within the scope of work for this contract*." Ohl MSJ Dec., Ex. 2, p. 1 (emphasis added). Premier ignores the critical qualifier in the italicized language, and incorrectly asserts that Vista's Rule 30(b)(6) witness, Phil Ohl, testified that Vista was obligated to incorporate *all* MOX comments before ever getting paid. This contention is belied by Vista's Rule 30(b)(6) testimony that "within the scope of work for this contract" in Line 1 means: "On the occasion when MOX or Premier, either one, would ask for a change in calculations required in designs of the vessel, that it would not be a normal – a covered comment resolution." Ohl Reply Dec., Ex. ZZ, p. 93:1-23 ( "Q:  So, if the scope of work changes, then Vista's fixed price also changes and comment resolution relating to that change and scope of work may also change? A:  Correct.").

Premier cherry picks other Vista testimony and takes it out of context. When testifying about the comment incorporation process, Mr. Ohl clarified, "I'm talking in a *general sense* of the review comment process." *See* Premier Resp. Br., pp. 11-12 (quoting Mr. Ohl) (emphasis added). Premier ignores additional testimony by Mr. Ohl explaining what actually happened on the MOX project:  MOX, through Premier, kept changing the tank designs and necessitating reanalysis by Vista such that MOX made it impossible to get a "completed" analysis on a final tank design. Ohl Reply Dec., Ex. AAA, p. 87:16— p. 92:11. Premier's Project Manager, President and Rule 30(b)(6) witnesses confirmed that MOX significantly delayed the project both by generating this extra work and by failing to

respond to Vista submittals. Vista Resp. SOF, Nos. 8, 10-22, 41. Premier consistently placed the blame on MOX for the associated delays and cost overruns. *Id.*

In fact, Premier's Project Manager modified the Purchase Order to permit Vista to bill MOX comment incorporation on a time and materials basis. In an email to Vista in June 2007, Ms. Raben agreed that Vista was to be paid time and materials for comment incorporation. Ohl Reply Dec., ¶ 7, Ex. WW. Premier's Rule 30(b)(6) witness confirmed that Ms. Raben made this agreement with Vista and was authorized to do so on Premier's behalf. Vista MSJ SOF, Nos. 19, 23. Accordingly, the Contract does not support Premier's position that Vista was required to incorporate *all* MOX comments before getting paid.

This is also an absurd interpretation that cannot be countenanced. *Navarrete v. City of Caldwell*, 130 Idaho 849, 851 (Idaho Ct. App. 1997) (contract must be reasonably subject to party's proffered interpretation). So long as MOX's requests for extra work and design changes are characterized as "comments," Vista's work scope was unlimited, because, according to Premier, the Contract required Vista to do whatever MOX demanded via its "comments." In other words, Vista's analysis work was never-ending with no entitlement to payment as long as MOX kept issuing "comments" that changed the design and requested work outside the Contract scope. There is no evidence that Vista agreed its work scope was unlimited in this manner. Rather, Premier requested that Vista do the extra work, Vista agreed to do so and Premier promised to pay. Vista MSJ SOF, Nos. 19-23, 33, 38, 53-55, 58-59, 68; Vista Resp. SOF, Nos. 21-24, 38-40, 51, 63.

### 5. Under Idaho Law, Premier Cannot Withhold Payment Based on MOX Comments Outside the Contract Scope.

When a contract specifies that a particular project is to be completed in a certain manner, and to the satisfaction of a third-party (as Premier contends here), the obligee (Premier) cannot simply object to the work, refuse payment to the obligor (Vista) and rest on the proposition that the third-party never gave its approval because it requested additional

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 8

work to be done outside the scope of the original contract. *See Puget Sound Nat. Bank of Tacoma v. C. B. Lauch Const. Co.*, 73 Idaho 68 (1952).

In *Puget Sound*, a construction contractor entered into a contract with an owner to build certain houses pursuant to contract specifications. *Id*. at 71. The contractor then subcontracted some of the paint work, which was to be performed "to the full and complete satisfaction" of the contractor and the owner. *Id*. at 72. Upon completion of the painting, the owner objected to the quality of the subcontractor's work due to fading and warping, claimed the performance was unsatisfactory, and demanded that an additional, third coat of paint be applied to all exterior surfaces. *Id*. at 72. The contract, however, only required two coats of paint. When the contractor refused to pay, the subcontractor's assignee brought an action demanding payment. *Id*. The Idaho Supreme Court affirmed the trial court's judgment for the subcontractor in the full amount, and refused to allow by way of offset for the third coat of paint which was applied by the contractor at the request of the owner. *Id*. at 73. The Idaho Supreme Court held:

> The contract in question provided that the painting job should be done to the full and complete satisfaction of certain specified persons. This means satisfaction to a reasonable person. By the terms of the contract, the owner or others were not entitled to additional or further work not specified in the subcontracts. *Id*. at 76.

The Court also resolved this hypothetical: "Suppose after the application of the third coat of paint the siding had still warped and the paint faded, or had the job still been unsatisfactory, could it reasonably be contended that [the subcontractor], who had contracted for a two paint job, should be required to put on a fourth? The question answers itself." *Id*. at 74.

Here, the fact that MOX issued revised tank designs and requested extra work (*i.e.* a third, fourth and fifth coat of paint) has no bearing on whether Premier is obligated to pay Vista. As with the subcontractor in *Puget Sound*, Vista is entitled to be compensated for all work performed in accordance with the Contract.

6. **The Contract Documents Must be Construed Against a MOX Approval Requirement.**

Construction of a contract creates a genuine issue of fact only if the contract is *reasonably susceptible* to the parties' conflicting interpretations. *Quality Resource Servs., Inc. v. Idaho Power Co.*, No. 08-145, 2010 WL 679018, \*4 (D. Idaho, Feb. 23, 2010). The Contract terms, Premier's own Rule 30(b)(6) testimony and its conduct over the course of the Contract do not reasonably support Premier's proffered interpretation.

a. **Premier's interpretation of MOX contract terms conflicts with that of its Rule 30(b)(6) witness.**

Premier claims that the terms of the Contract cannot be construed against it as the drafter, on the basis that some portions of the Contract, specifically, the MOX specifications, were drafted by MOX. As set forth above, however, Premier relies on several provisions from the Purchase Order to manufacture a MOX approval requirement. Premier admitted that it drafted the Purchase Order, so those terms must be construed against it. *See* Vista MSJ, p. 18. The Premier-drafted Purchase Order also incorporated MOX contract documents and specifications by reference. Premier cannot avoid the interpretation of its Rule 30(b)(6) witness that when "flowing down" the terms of the MOX contract documents and specifications to Vista, those provisions are to be interpreted as applying solely between Premier and Vista, *i.e.* MOX is read entirely out of the Contract. Vista Resp. SOF, No. 25.

b. **The parties' conduct shows that Premier did not believe it had any right to condition payment on MOX "approval."**

Premier agrees that the parties' conduct may be used to construe the Contract. Premier Resp. Br., p. 20. Here, the parties' conduct shows no MOX approval requirement.

i. **Premier paid 31 Vista invoices without reservation.**

Premier's Rule 30(b)(6) witness testified that Premier made payment of Vista's first thirty-one (31) invoices *without* protest or reservation of rights. Vista MSJ SOF, No. 28 (citing Clezie 30(b)(6)). Given this, Premier cannot claim that it made each payment under

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 10

a "reservation of rights." Premier has yet to present a single document or identify a single communication in which it informed Vista that its work was rejected and that Premier's payments were simply "progress payments" that were subject to a later refund.

>         ii.    **After MOX de-scoped the slab tank work from**
>                **Premier's contract, Premier agreed to pay Vista for**
>                **Vista's slab tank work done to that point**

Premier admits that Vista's "invoicing was appropriate pursuant to actual fixed-price revisions to the Purchase Order, which occurred 14 times." Premier Resp. Br., p. 14. As Premier admits this is the case, it must pay invoices 32-34 issued pursuant to Revision 14. Premier issued Revision 14 after MOX de-scoped the slab tank work from Premier's Contract expressly due to Premier and MOX's dispute over dynamic analysis. Vista MSJ SOF, Nos. 47-55. Line items 15-38, 48, and 59-62 on Revision 14 total the $627,027 charged on Vista invoices 32-34. Ohl MSJ Dec., ¶¶ 35-39, Ex. 10 (last P.O. revision), Ex. 17. The totals in those line items also match the Vista change orders that Premier admittedly approved. *Id*; *see also* Clezie Dec. (Doc. 103-1), ¶ 31 (admitting that Premier approved Vista's slab tank change orders). Premier does not dispute this.

>         iii.   **Premier cancelled the Contract without cause and**
>                **at the same time promised to pay Vista for its work**
>                **to date.**

In June 2008, Premier cancelled Vista's Contract without cause. Vista MSJ SOF, Nos. 68, 69. Premier's claim that it never promised to pay for the work performed prior to cancellation is belied by a plain reading of Premier's cancellation letter, which provides that Vista "shall be paid" for charges that "resulted from work performed prior to the cancellation." Ohl MSJ Dec., Ex. 18. Premier's responses to Vista's requests for admission admit that "Vista was not terminated for cause." Vista MSJ SOF, No. 69 (citing Resp. to RFA No. 12).

        **c.**      **Premier never availed itself of the Contract's specific mechanism for addressing any alleged non-performance by Vista.**

Section 10 of Premier's Standard Purchase Order Terms & Conditions provides that, "Seller agrees to replace or correct defects not conforming to the foregoing warranty promptly, without expense to Buyer, *when notified of such non-conformity by Buyer*." Ohl MSJ Dec., Ex. 4 (emphasis added). If the work was unacceptable or "non-conforming," then Premier was obligated to notify Vista of the defects and non-conformities and provide an opportunity to cure pursuant to this provision. Premier had the opportunity to do so when it paid each of Vista's 31 invoices, again when Vista submitted and Premier approved Vista change orders for work already performed, again when Premier issued Purchase Order Revision 14, and again when Premier issued its cancellation letter. But it did not and still has not identified a single defect in Vista's engineering calculations and analyses.

        **d.**      **Nothing in Vista's conduct reflects an acknowledgement that Vista was not entitled to be paid due to lack of MOX "approval."**

None of the evidence cited by Premier reflects Vista's agreement or acknowledgement of a MOX approval condition of payment. Premier relies on Section 22 of the Purchase Order, which provides that "time is of the essence." This does not help Premier. As set forth fully in Vista's response to Premier's MSJ, pp. 20-26, Vista timely submitted its deliverables in accordance with the delivery dates in the Purchase Order and its revisions. Premier's auditor agreed that Vista's deliverables were timely under the Contract. *Id.* Any delays were due to MOX and Premier knew it. *Id.*

Premier also points to Vista's January 6, 2008 and June 4, 2008 estimates as "evidence" that Vista could not meet the Contract deadlines. Premier deliberately misconstrues these estimates, which were based on schedule extensions and cost increases driven by MOX design changes and requests for additional or conflicting analysis – not Vista delays. Clezie Dec. (Doc. 103-1), Exs. F, G; Vista Resp. SOF, Nos. 44-50, 60-62.

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 12

The contractors hired to complete the engineering project did not even meet Vista's proposed schedules for either annular or slab tanks. *Id.* Premier admitted throughout the project and *even after Premier filed its Counterclaim* that MOX's conduct delayed the project and contributed to huge cost overruns. *See* Vista Resp. SOF, Nos. 10-22. Premier wholly fails to address these realities of the project and cannot avoid its own admissions.

Moreover, Vista's agreement to perform dynamic analysis at MOX's request does not amount to an agreement that MOX "approve" Vista's work before Vista is entitled to payment.[3] In fact, Premier consistently maintained with both MOX and Vista that dynamic analysis was outside the scope of the contract specifications and executed Purchase Order revisions to cover the increased time and cost for Vista to perform this work. Vista Resp. SOF Nos. 32-40; Vista MSJ SOF, Nos. 33-36. Premier also acknowledged that MOX dictated a method of dynamic analysis that was flawed, telling Vista that it was "appropriate" for Vista's engineer to apply only a limited P.E. stamp to Vista's application of that "Denver Method." *See* Ohl MSJ Dec., ¶ 31, Ex. K.

Vista also did not acknowledge that it "merited no further payment." Premier Resp. Br., p. 23. Throughout its response brief, Premier cites to five Vista e-mails attached to

---

[3] Contrary to Premier's claims, Vista did not "execute" any documents with MOX regarding implementation of dynamic analysis. Premier cites only to the email correspondence between Ms. Raben and Vista's lead engineer, George Crawford, regarding the limited P.E. stamp issue. Premier Resp. Br., p. 23 (citing Ohl MSJ Dec., Ex. K). Premier presumably intended to cite the Report on the Seismic Analysis Workshop. Ohl MSJ Dec., Ex. I. This report was the result of the July 2007 meeting in Denver during which MOX dictated its "Denver Method" of dynamic analysis (*i.e.* MOX's attempt to conform the 1970s French analysis method to meet the applicable U.S. ASME requirements). Ohl MSJ Dec., ¶ 26; Vista SOF Resp., No. 37. The front cover of that report merely shows that the report was "Reviewed by" Mr. Crawford. Ohl MSJ Dec., Ex. I. Upon review of the report, Mr. Crawford detailed a number of problems with the Denver Method to Ms. Raben. Ohl MSJ Dec., Exs. J, K. Premier wholly fails to dispute this evidence. Premier directed Vista to perform extra work correcting the flaws in the Denver Method and agreed to pay for that work by approving Vista's change orders and issuing Purchase Order Revision 14 in March 2008. Vista Resp. SOF, Nos. 39-40.

Scott Hansen's declaration. Premier, of course, cites the e-mails out of context and none of them supports Premier. Each is addressed in turn.

Hansen Exhibit A:  In his September 24, 2006 e-mail, Mr. Crawford acknowledges to his Vista colleagues that the assumption of equivalent static analysis in Vista's project proposal to Premier may not be acceptable to MOX. This email is immaterial. Vista's proposal clearly provides that a requirement of dynamic analysis will result in cost and schedule impacts. Premier accepted the proposal without objection. Vista Resp. SOF, No. 30. Premier, in fact, maintained all along that equivalent static analysis *was* justified. Premier even admitted that MOX had improperly rejected static analysis because MOX applied Vista's justification analysis to the *wrong tank model*. Vista Resp. SOF, Nos. 32-34; Vista MSJ SOF, Nos. 33-37. Vista's assumption of static analysis is also a moot point, as Vista agreed to perform dynamic analysis on slab tanks and Premier agreed to pay Vista for the extra work. Vista Resp. SOF, Nos. 36-40.

Hansen Exhibit B: In his September 26, 2007 e-mail, Vista's President, Phil Ohl, told Premier's CFO, Shelly Sayer:

> Given the length of time the 'Denver Method' and MOX services comment incorporation has added to the overall schedule, we would like to discuss a mechanism for invoicing progress payments for partial completion of Line 48 (The Denver Method) and partial completion of Tank Analysis before MOX Services acceptance of Comment Incorporation.

Premier misconstrues this e-mail, a year into the project, to assert that Premier's payments on Vista invoices were nothing more than, "progress payments" that later needed to be refunded because MOX never "accepted" the work. At the time Mr. Ohl sent it, Ms. Raben had already agreed to pay Vista time and materials for incorporation of MOX comments outside the Contract scope. Ohl Reply Dec., ¶ 7, Ex. WW; Vista MSJ SOF, Nos. 19, 23. The email simply confirms that Vista sought to establish an invoicing method for time and materials payments because of the large dollars and extended time necessitated

by Vista's "progress" towards the resolution of MOX's insatiable demands for extra work via its "comments" and insistence upon the Denver Method. Premier and Vista did, in fact, establish a process to allow Vista to invoice for those time and materials costs pursuant to Purchase Order revisions. Vista MSJ SOF, No. 24. Nothing in Vista's email suggests that Premier's payments on Invoices 1-31 (which cover both fixed price and time and materials work) were conditional payments subject to a later refund. Ohl Reply Dec., ¶¶ 14, 15.

Hansen Exhibit C: In his January 14, 2008 e-mail, Mr. Ohl told Mr. Crawford, that, following a telephone call with Premier's Executive Director, Hans Carstensen, his perspective is that, "we went from a potential of being fired and sued and not get paid to no discussion of law suit, better than 50/50 of being paid for work performed…." This email merely reflects Mr. Ohl's concern that Mr. Carstensen would not understand that MOX was driving the cost and schedule impacts with its comments and flawed Denver Method. Ohl Reply Dec., ¶ 16. In contrast, Premier's Project Manager, Ms. Raben, who was intimately involved in the day-to-day aspects of the project, frequently voiced her frustrations about MOX. Ohl Resp. Dec., ¶¶ 20-37, Exs. BB-DD.

Exhibit C also contains a January 14, 2008 e-mail in which Mr. Crawford vented to Mr. Ohl that M&D's analysis on a three-tank set[4] as a subcontractor to Vista was "embarrassing." The quoted statements are specific to M&D's performance on the three-tank set only and do not reference Vista's analysis of the other tanks. The email simply acknowledges that M&D did not perform well on those analyses. Premier de-scoped the three-tank set work before Vista had an opportunity to correct M&D's work. Ohl Reply Dec., ¶ 17; Vista MSJ SOF, Nos. 53-55.

Hansen Exhibit D: In a June 11, 2008 e-mail, Mr. Crawford told Mr. Ohl that Vista's schedule during April and May 2008 was "abysmal." Again, Premier takes this e-

---

[4] The set included one slab tank and two annular tanks. Ohl Reply Dec., ¶ 17.

mail out of context and applies it to the whole of Vista's work. Mr. Crawford's e-mail explains that, *between April and May 2008*, MOX design changes related to a "rising flat bar" had derailed the schedule ahead of that analysis. Premier ignores that, once again, *MOX* design changes caused the referenced "abysmal" schedule performance.

Hansen Exhibit E: In an August 9, 2007 e-mail to his Vista engineers, Mr. Crawford describes a common misconception regarding "secondary stress" – one component of Vista's analysis work. The e-mail ends with direction to Vista engineers correct the misconception. The misconception did not affect any earlier calculations and Premier was not charged for correcting it. Ohl Reply Dec., ¶ 18. Again, this e-mail does not serve as a universal indictment of Vista's work.

On the whole, Premier and Vista's undisputed conduct shows that neither party ever interpreted the Contract as conditioning payment to Vista on MOX's approval.

### 7. Even if MOX or Premier Never "Approved" Vista's Work, Premier Cannot Rely on the Non-Approval Because Premier Has Not Identified Any Reasonable Basis for the Failure to Approve – As Required by Idaho Law.

Premier's response brief completely ignores Vista's cited legal authority that there must be a reasonable basis for MOX and Premier's alleged failure to approve Vista's work. Vista MSJ, p. 22 (citing *Cheney v. Jemmett*, 107 Idaho 829, 932 (1984)). In *Cheney*, the Idaho Supreme Court held that "Where a contract provides that the matter of approval of performance is reserved to a party,[5] he must act fairly and in good faith in exercising that right. He has no right to withhold arbitrarily his approval; there must be a reasonable justification for doing so." *Cheney*, 107 Idaho at 832 (internal quotations omitted) (quoting *Prince v. Elm Investment Co.*, 649 P.2d 820, 825 (Utah 1982)).

---

[5] "The principles governing agreements conditional upon [one party's] satisfaction apply with at least equal force to agreements conditional upon the satisfaction or approval of third persons." 13 *Williston on Contracts* § 38:25 (4th ed.); *see e.g.*, *Puget Sound Nat. Bank of Tacoma v. C. B. Lauch Const. Co.*, 73 Idaho 68 (1952).

In cases involving commercial parties, as here, a satisfaction requirement "must be determined by what a reasonable person in the same situation would find satisfactory." *Meredith Corp. v. Design & Lithography Center, Inc.*, 101 Idaho 391, 393-94 (1980). In other words, whether or not Vista performed under the Contract cannot be wholly and completely dependent upon MOX's actual approval or lack thereof; it is to be determined under an objective standard. When an objective standard is applied, what is considered "reasonable" is to be established through the use of commentary and opinion from experts in the relevant field. *See id.* at 394 (printing work in question was for a commercial purpose and experts in printing and advertising fields could comment on its fitness for that purpose). As set forth below, Vista's expert witness, Roger Reedy, opines that Vista's work was state of the art and complied with the Contract.[6]

In response, Premier has not identified any error or deficiency in Vista's 28 South Carolina P.E. stamped reports and has not identified any calculations or analyses that Vista failed to perform as required by the Contract specifications. Premier just repeats its refrain that Vista never provided an "acceptable" or "approved" deliverable. Premier Resp. Fact, No. 26. The report of Premier's expert witness, SC Solutions, adds nothing. *Id.* (citing Premier Ex. 7). The only basis for SC Solutions' opinion that Vista's calculations did not meet the Contract specifications is simply that they were "never accepted by MOX." Premier Ex. 7 at pp. 12-15. Indeed, SC Solutions opines that Vista's slab tank work qualified the tank "according [to] the project specification." *Id.* at p. 13.

SC Solutions does not dispute that Vista also qualified the annular tanks according to the project specification. Rather, it merely asserts that MOX did not approve Vista's annular tank work because "the review process was never completed," "MOX's comments were generally appropriate, and MOX was "justified in not approving Vista's initial annular

---

[6] Mr. Reedy has submitted a sworn declaration verifying the contents of his report.

tank submittals." *Id.* at pp. 14-15.  These opinions are immaterial.  Like Premier, SC

Solutions ignores that MOX's "review process" entailed ongoing design changes and

demands for extra work via its comments. Vista Resp. SOF, Nos. 6-24.  SC Solutions also

fails to identify *any* basis – let alone the requisite objective basis—to support its conclusions

that MOX's comments were "generally appropriate" and that MOX was "justified" in not

approving Vista's annular tank calculations.  Premier Ex. 7, pp. 14-15.

Premier has not presented any evidence of a reasonable basis for its contention that

Vista's work was "unacceptable." Its defense and Counterclaim fail for this reason alone.[7]

> **8.     Even if there is a MOX Approval Requirement and MOX Failed
> to Approve Vista's Work, Premier Waived its Right to Assert
> That As a Condition of Payment.**

Premier has waived any rights to deny payment based on lack of MOX approval.

*See* Vista MSJ, p. 25 (citing *Tentinger v. McPheters*, 132 Idaho 620, 621 (1999) (waiver by

failing to address defects in performance until counterclaim filed); *Olson v. Quality-Pak Co.*,

93 Idaho 607 (1970) (delay in enforcing payment amounted to waiver by contractor).

Premier wholly fails to address either of these cases.  As in *Tentinger* and *Olson*, Premier's

waiver is evidenced by its failure to enforce its alleged rights, coupled with its contradictory

conduct in paying Vista's first 31 invoices without reservation, and promising to pay for

Vista's unpaid work by issuing Purchase Order Revision 14 and its letter cancellation

"without cause" stating that Vista "shall be paid" for work performed prior to the

cancellation. *See* Section II(B)(6), *supra*; Vista MSJ, pp. 25-26.

---

[7] Vista's research did not reveal any case law in which the obligee successfully
demonstrated its rejection was reasonable without providing any objective basis for that
determination.

### 9.   Contract Terms Cited by Premier are Unavailing.

#### a.   The no-waiver provision does not help Premier.

Premier cites the "No waiver" provision in Section 9 of Premier's Standard Purchase

Order Terms and Conditions:

> The failure of Buyer (Premier) to insist, in any one or more instances, upon
> the performance of any of the terms, covenants or conditions of this Order or
> to exercise any right hereunder, shall not be construed as a waiver or
> relinquishment *of the future performance* of any such terms, covenants or
> conditions *or the future exercise of such right,* but the obligation of Seller
> (Vista) *with respect to such future performance* shall continue in full force
> and effect. Ohl MSJ Dec., Ex. 4 (emphasis added).

Premier ignores that the "no waiver" only applies to Vista's *"future performance."*

By its terms, this provision does not apply to Premier's waiver of alleged deficiencies in

work Vista had already performed. As explained in the preceding section, Premier waived

its rights to deny payment by paying for work Vista had already performed and by

promising to pay for work Vista had already performed– all without reservation, protest or

notice of any defects in that work.

#### b.   The inspection provision does not help Premier.

Premier relies on Section 9 of the Purchase Order, which provides that "Buyer

reserves the right to make such rejection at any time after the products are examined or

services evaluated." Premier asserts that, "after inspecting Vista's submittals, Premier

discovered that Vista's work fell well short of the Contract requirements." Premier Resp.

Brief, p. 32. The assertion is unsupported by any citation to evidence and cannot be used to

create a genuine issue of fact. Fed. R. Civ. P. 56. In any event, Premier fails to explain *how*

Vista's work "fell short." Even at this late stage of the litigation, after *years* of time to

"inspect" Vista's submittals, Premier has failed to identify a single error or deficiency in

Vista's calculations or identify any analysis required by the contract specifications that Vista

did not perform, *i.e.* the requisite reasonable basis for rejection. *See* Section II(B)(7), *supra.*

For the same reasons stated above, Premier has also waived its right to reject Vista's work "at any time," *i.e.* in litigation seven months after cancellation *without cause*.

### 10.   As a Matter of Law, Premier Accepted Vista's Work.

Premier asserts lack of affirmative "acceptance" or "approval" to dispute that it ever accepted or approved Vista's work. However, payment plus failure to make any reservation of rights and silence for several months constitutes an acceptance and release and discharge of additional claims. *See APAC Carolina, Inc. v. Town of Allendale, South Carolina*. 41 F3.d 157, 163-167 (4th Cir. 1994); *see also Amato v. United States*, 94 F. Supp. 2d 1077, 1079 (D. Idaho 1999) ("when silence follows words that are indicative of manifestation assent, any offeror would reasonably conclude that the silence constitutes confirmation of the manifestation of intent."); *Vogt v. Madden*, 110 Idaho 6, 8-9 (Ct. App. 1985) (adopting Restatement (Second) of Contracts, § 69, at 165) (silence and inaction operate as an "acceptance" where "offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation"). Under these principles, Premier's acceptance of Vista's work is manifested in Premier's unqualified payments and promises to pay, coupled with Premier's failure to reject Vista's work until it filed its Counterclaim—seven months following Contract cancellation and two years after payment of Vista's first invoice. Vista MSJ SOF, No. 30.

#### a.   Premier never rejected Vista's work.

Premier's contention that it, like MOX, never "accepted" or "approved" Vista's work is belied by the sheer absence of any document presented to this Court showing that Premier ever informed Vista that its work had been rejected *at any time* before Premier filed its Counterclaim in this action. Nor has Premier identified any such verbal communication to Vista. The Court has previously commented on the deficiency of Premier's evidence on this

issue. *See* Doc. 64, p. 4 (order granting Vista's motion to amend – noting that "Premier does not provide the Court with any written notices to Vista that its designs were deficient.").

Premier and MOX also failed to reject Vista's work according to the proscribed contractual method for doing so. Premier Resp. Br., pp. 25-26. Section 1.19(h) of the MOX Section E Terms & Conditions provides that "DCS" [here, "Premier," under Premier's Rule 30(b)(6) interpretation] "response to submittals 'for approval' will be by separate letter or response transmittal. The following status codes are the only codes authorized for use by DCS [*i.e.* Premier] in responding to transmittals." The provision then lists five (5) status codes to be transmitted in "response" to Vista's submittals. Status code "5" is "Rejected – Submitted item found to be unacceptable, or not in accordance with the Subcontract, as identified by comments. Supplier/Subcontract shall respond as noted and resubmit the correct information." Ohl MSJ Dec., Ex. 6.

Premier admits that a "Rejected" status code 5 was never issued against Vista's work – by MOX or Premier – in response to Vista's 28 P.E. stamped reports, which were submitted to Premier from October 2007 through April 2008. Premier Resp. Br., pp. 26-27; Vista Resp. SOF, No. 52. Premier tries to diffuse this undisputed fact by asserting that, "[b]efore a rejection code would be entered, resolution of the comment and review process would occur." *Id.* (citing Premier Fact Resp. ¶ 93). This assertion contradicts the very definition of "Rejected" under Section E, § 1.19, which directs the Subcontractor (Vista) to incorporate the comment by resubmitting a corrected submittal. Thus, a Rejected status code *precedes*, not follows, the "resolution of the comment and review process." Indeed, Section E § 1.19 says nothing about "resolving all comments" before a status code is issued. Premier's assertion is also unsupported. Premier cites no contractual provision or testimony

to support its assertion that a Rejected status code occurs only after resolution of the comment and review process.[8]

Further confirming that Vista's work was not "unacceptable," Premier requested that Vista turn over all of its work in progress, which Vista did. Ohl MSJ Dec., ¶¶ 53-54, Ex. 18. Vista's annular tank work was then given to M&D, upon which M&D indisputably relied in performing its work for Premier. Vista SOF, Nos. 102, 103; *see also* Ohl Reply Dec., ¶ 19. Premier claims that it had the right to retain any "rejected products" created by Vista. Premier Resp. Br., p. 25. This is undisputed, but immaterial as Premier never rejected any of Vista's work.

### b. Premier made payments on and agreed to pay for work that Premier now claims is "unacceptable."

As established previously, Premier made payments of $672,000 and written promises to pay for additional Vista work (by issuing Revision 14 and in its letter of cancellation without cause) – not once telling Vista that its work had been rejected and that Premier would one day claim a refund and renege its contractual promises to pay.

### 11. Premier is Estopped to Assert Lack of MOX Approval As a Basis Not to Pay Vista.

Premier responds to Vista's estoppel argument solely by asserting that it "relied on Vista's misrepresentations that it could perform the work in accordance with the Purchase Order." Premier Resp., p. 33. Thus, Premier concedes two essential elements of quasi-

---

[8] Premier's citation to Ms. Clezie's declaration does not support Premier. *See* Premier Fact Resp. ¶ 93, citing Ms. Clezie's declaration, ¶ 42. Ms. Clezie merely states that, upon receipt of Vista's January 6, 2008 estimate for completion of slab tanks, "there was no need for MOX to go back and enter a status code 'Rejected' at that time." Ms. Clezie says nothing about the status codes for Vista's annular tank work, which continued into June 2008. Her statements lack foundation and contradict her testimony in any event. Ms. Clezie admitted in her Rule 30(b)(6) testimony that she lacked any knowledge regarding the process for transmitting status codes from MOX to Premier and then to Vista. Ohl Reply Dec., Ex. BBB, p. 50:20—p. 51:3. She also admitted that "Vista received a response to every single one of its submittals under the Contract." *Id.* at p. 52:14—p. 53:17. Premier admits that not one of those responses was "Rejected." Premier Resp. Br., pp. 26, 27.

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 22

estoppel: 1) its present position that Vista is not entitled to any payment is entirely inconsistent with its conduct prior to filing its Counterclaim and 2) Premier's conduct induced Vista to continue incurring substantial time and cost providing valuable work and voluminous invoice detail to Premier to the severe economic disadvantage of Vista.  Vista MSJ, pp. 26-28; *Grover v. Wadsworth*, 147 Idaho 60 (2009) (quasi-estoppel prevents a party from asserting to another party's disadvantage a right that is inconsistent with a previous position; it applies when it would be unconscionable to allow the party to maintain the inconsistent position).

Premier's citation to *C&G, Inc. v. Canyon Highway Dist. No. 4*, 439 Idaho 140 (2003) is misplaced.  As Premier notes, the *C&G* plaintiff "did not have knowledge of the facts or its rights at the time the original position was taken." Premier Resp., p. 33.  Here, in contrast, Premier cannot pretend that it did not have knowledge of the facts or its rights to reject Vista's work until M&D completed its work. *Id.* at pp. 32-33.  Premier's Rule 30(b)(6) witness testified that Premier *was aware*, both when MOX de-scoped the slab tank work in February 2008 and, again, when Premier cancelled the Contract in June 2008, that Vista had failed to provide "acceptable" deliverables under the Contract.  Vista MSJ SOF, Nos. 52 and 71 (citing Clezie 30(b)(6)).  At those points, instead of enforcing its alleged right to demand a refund and deny further payment, Premier promised to pay Vista for the work it had performed. *See supra*.

Furthermore, as noted above, MOX confirmed that it was *Premier's* – not MOX's – responsibility to ensure Vista's work was contract and ASME Code compliant.  Ohl Reply Dec., Ex. YY; Ohl Resp. Dec., Ex. U, pp. 5-7.  Premier's contractual and code responsibilities simply cannot be reconciled with the self-serving pretense of ignorance in its summary judgment briefing.

### 12.    Premier Prevented Vista From Completing the Comment Review Process and Obtaining MOX "Approval."

Premier prevented MOX's approval of the final report for slab Tank 8000 by failing to submit it to MOX. *See* Vista MSJ, pp. 23-24. Premier's expert cites MOX's failure to receive Vista's Tank 800 report as the only reason MOX allegedly failed to "approve" it. Vista MSJ SOF, No. 45. Premier does not dispute its expert's opinion.

Instead, Premier claims that Vista's January 6, 2008 estimate to complete the slab tank work "caused" Premier not to submit the final Tank 8000 report to MOX. The record belies this assertion. On January 14, 2008, *after Premier received Vista's January 6, 2008 estimate*, Ms. Raben sent an email directing Vista to continue working on the Tank 8000 report, which Vista completed and submitted to Premier on January 26, 2008. Ohl Reply Dec., Ex. WW; Vista MSJ SOF, No. 43. On January 8, 2008 (also after Premier received Vista's estimate), in response to Vista's status report on Tank 8000, Ms. Raben told Vista, "you're cruisin'." Ohl Resp. Dec., ¶ 40, Ex. FF. On January 28, 2008, two days after Vista submitted its Tank 8000 report, Ms. Raben told Vista, "Doug [Premier's President] wanted me to let you know how happy he was to see you finished early." Ohl MSJ Dec., Ex. M. Vista's January 6, 2008 estimate could not have "caused" Premier not to submit Vista's Tank 8000 report to MOX when Premier *subsequently* directed Vista to continue working on it and praised Vista for its swift completion of the report.

Therefore, there is no question that Vista is entitled to be paid for its work on Tank 8000, which totals $ 322,577.49 on Invoices 33 and 34. Vista MSJ, p. 24.

Premier also prevented Vista's completion of its work on the remaining slab tanks and two annular tanks by de-scoping that work in March 2008, after Premier agreed to a secret modification of its contract with MOX in February 2008. Vista MSJ, pp. 23-24. Premier claims that Vista's January 6, 2008 estimate to complete the slab tank work "forc[ed] MOX's de-scoping of its slab tank contract with Premier." Premier Opp., p. 13.

Again, this is false. Premier's February 19, 2008 written modification agreements with

MOX identified one reason only for MOX's de-scoping of the slab tanks and two annular

tanks: "***the reason for this modification is due to Premier and MOX's inability to reach***

***agreement on the contract requirements to perform Static or Dynamic Analysis for***

***Seismic Qualification of Slab Tanks***." Ohl MSJ Dec., Ex. 15, § A (emphasis added).

Confirming this, Premier never notified Vista that the reason for the de-scoping was Vista's

alleged inability to perform, unacceptable work, cost overruns, schedule delays or Vista's

January 6, 2008 estimate. Ohl Reply Dec., ¶ 9. Premier has not presented a single

document to this Court or testified to a single communication to Vista that proves

otherwise.[9] Instead, the undisputed evidence shows that Premier *subsequently* approved

Vista's change orders for slab tank work *already performed*, including Tank 8000, and

issued Purchase Order Revision 14 with line item prices that matched the agreed totals in the

change orders. Thus, contrary to its present position, Premier knew and agreed that Vista

was entitled to payment of those costs.

Premier also stopped Vista's comment incorporation work in process by cancelling

the Contract in June 2008 without cause. Vista had already qualified eleven of the annular

tanks by issuing 24 P.E. stamped reports. Vista Resp. SOF, No. 52; Vista MSJ SOF,

Nos. 105-109. Even M&D agrees this is the case. Vista Resp. SOF, No. 106. Through

Spring 2008, Vista was working to incorporate MOX comments on the annular tanks related

to design changes and extra analysis outside the Contract scope. Vista Resp. SOF, No. 51.

Premier claims that Vista's June 4, 2008 estimate to finish this comment incorporation work

---

[9] Premier also plays fast and loose with the facts by asserting, without citation to evidence, that the de-scoping prevented Premier "from enjoying the benefit of earning any more money from MOX for fabrication of any slab tanks." Premier Resp. Br., p. 14. Both of the MOX-Premier de-scoping agreements state that "MOX Services will deduct no funds from the subcontract." Ohl MSJ Dec., Ex. 15, § D. Premier's Rule 30(b)(6) witness confirmed that Premier lost <u>no money</u> under its contract with MOX and that Premier thereafter fabricated the slab tanks based on engineering packages provided by MOX. Ohl Reply Dec., Ex. BBB, p. 108:16-19; Ohl Resp. Dec., Ex. Z, p. 34:5-17.

"forced" Premier to cancel the Contract. Again, this argument wholly ignores the numerous Premier admissions by its President, project manager and Rule 30(b)(6) witnesses that MOX– not Vista - drove the cost overruns and schedule delays on the project. Vista Resp. SOF, Nos. 10-24.

Vista's June 4, 2008 estimate appropriately detailed for Premier what it would take in terms of dollars and time to perform the added work scope and complete the MOX comment incorporation. Clezie Dec. (Doc. 103-1), Ex. G. The appropriateness of Vista's estimate is only underscored by the fact that M&D did not even meet Vista's proposed schedule, even though M&D had a reduced work scope (*i.e.* less analysis to perform) and relied on Vista's work. Vista Resp. SOF, Nos. 61-62; Vista MSJ SOF, Nos. 102-104.

Vista does not dispute that Premier had the option to cancel the Contract "with or without cause," (Ohl MSJ Dec., Ex. 4, § 3) and find a new subcontractor to finish out the project. Premier, in fact, admittedly cancelled the Contract *without cause* and hired M&D. But the Contract specifically provides that Premier is nevertheless "liable" to pay Vista, "to the extent unpaid, the price for all products or services which have been fabricated or performed and delivered to [Premier] in accordance with this Order." Ohl MSJ Dec., Ex. 4 § 3. As noted, Premier's Project Manager agreed to modify the Purchase Order to pay Vista time and materials for the comment incorporation work. Consistent with this agreement, Premier's cancellation letter agreed that "Vista shall be paid" for its work performed prior to cancellation. The law does not allow Premier to avoid payment for that work by stopping Vista's work in process. *Sullivan v. Bullock*, 124 Idaho 738, 741-42 (Ct. App. 1993).

C.     **As a Matter of Law, Premier Cannot Deny Payment to Vista on the Basis that Vista Violated the Engineering Standard of Care.**

1.     **It is the Opinion of Vista's Expert, Roger Reedy that Vista's Engineering Work was "State of the Art."**

Vista's expert report, by Roger Reedy, submitted with Vista's opening brief, provides competent evidence that Vista's work was acceptable and met the standard of care. Ohl MSJ Dec., Ex. B; *see also* Declaration of Roger Reedy. "Vista provided the Section VIII, Div. 1 verification and analysis as required by the Premier Purchase Order and described in their proposal (Vista 00077), consistent with the annular tank and slab tank procurement specifications. My opinion is that Vista's Code verification work was acceptable...MOX and Premier had no valid basis to reject or fail to approve Vista's work as non-compliant with the contract specifications." Ohl MSJ Dec., Ex. B, pp. 17-18. "It is my opinion that the work performed by Vista more than met the state-of-art professional standards for the design and analysis activities performed." *Id.* at p. 18.

Premier ignores Mr. Reedy's opinions regarding Vista's "state of the art" work. Instead, Premier relies on the testimony of a *different* Vista expert to assert that Vista never designated an expert to testify on this topic. Premier Resp. SOF, No. 26. That assertion is flatly refuted by Mr. Reedy's expert report. *See* Ohl MSJ Dec., Ex. B. Premier also tries to avoid Vista's experts' opinions by asserting that statements in expert reports are "unsworn." That objection is easily resolved – both Vista experts have submitted sworn declarations verifying the truth of their respective reports. *Jacobsen v. Katzer*, 2009 WL 4823021, *4 n.1 (N.D. Cal. 2009) (supplemental affidavit allowed for admissibility of report).

2.     **Premier Has Not Supplied Any Material Evidence to Suggest that Vista Violated the Engineering Standard of Care.**

Premier offers no testimony, expert or otherwise, to suggest that Vista violated the standard of care and failed to perform to the competency of other engineers in its field. *See* Doc. 73 (Premier's amended Counterclaim), ¶¶ 24, 25. Premier merely recites its refrain

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 27

that "Vista never completed its work in accordance with the Purchase Order and Project

Specifications." Premier Resp. Fact, ¶ 26. As set forth in Section II(A), *supra*, Premier's

sole basis for this contention is that MOX never approved Vista's work. Premier has yet to

present *any* evidence that MOX's lack of approval equates to a standard of care violation.

Premier merely argues, without citation to evidence, that "Vista's failure to adhere to

the standard of care...is reflected in no small part by the fact that MOX never accepted

Vista's work." Premier Resp. Br., p. 12. But the evidence in this case shows that the *only*

basis for lack of MOX's "acceptance" is that MOX had insatiable demands for extra work

outside the Contract scope. Acceptance cannot be withheld on that basis. *See supra*,

Section II(B)(5), *supra*. Additionally, Premier offers no expert opinions of MOX (who is

not a designated expert of Premier in any event), nor has Premier offered any evidence that

MOX is qualified to opine as to whether Vista met the standard of care. The unsworn

opinions of Premier's expert are equally unhelpful to Premier.[10]   Section II(B)(7), *supra*.

### 3. Premier's Opportunity to Complain About the Quality of Vista's Work Has Long Since Past.

Just like its MOX "approval" argument, Premier has waived any right and is

estopped to refuse payment based on Vista's alleged substandard performance because

1) Premier made payment on Vista's first 31 invoices without reservation or protest,

2) Premier agreed to pay for Vista's slab tank work by approving Vista's change orders and

issuing Purchase Order Revision 14, 3) Premier agreed to pay for Vista's annular tank work

by cancelling the Contract without cause and promising that Vista "shall be paid" for work

performed prior the cancellation, and 4) despite its contractual and ASME Code

---

[10] A significant portion of SC Solutions' report is dedicated to a recitation of the project
specifications and a discussion of MOX's rejection of Vista's feasibility study for equivalent
static analysis on slab tanks. Premier Ex. 7, pp. 5-12. The opinions on these issues are
immaterial. Once MOX directed dynamic analysis, Vista agreed to perform it and Premier
issued Purchase Order revisions increasing the price and extending the deadlines for Vista to
perform this extra work. Vista MSJ SOF, Nos. 32-37; Vista Resp. SOF, Nos. 30-40.

responsibilities for Vista's work, Premier never once asserted that Vista failed the standard of care until Premier filed its *amended* Counterclaim in February 2010. Premier fails to dispute that Vista has been substantially harmed by this conduct. *See* Section II(B)(6)(8)(11), *supra*; Vista MSJ, pp. 24-28.

### 4. Premier's Own Expert and Witness Admit that Vista's Work Met the Contract Specifications and Engineering Standard of Care.

#### a. Premier does not dispute that its own expert concluded that Vista qualified Slab Tank 8000, met the contract specifications and engineering standard of care.

Premier fails to dispute SC Solution's opinion that Vista's Tank 8000 report qualified Tank 8000 according to the Contract specifications and met the engineering standard of care. Vista MSJ SOF, No. 44; Premier Resp. Br., pp. 27-28. Showcasing the damaging impact of its own expert's opinions, Premier tries to avoid them by asserting that the opinions are unsworn. Premier Resp. Br., pp. 27-28. But Premier has waived any objections to the admissibility of its own expert report by offering the report as evidence itself. *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005); Premier Resp. Fact, No. 26 (citing entire SC Solutions report).

Premier also mistakenly cites an email from Mr. Crawford to assert Vista's "cognizance" that it should not be paid for its work on Tank 8000. Premier Resp., p. 29 (citing Fact Resp. ¶ 47). As explained above, a plain review of the cited email shows that Mr. Crawford was solely referencing M&D's work as a subcontractor for Vista on the three-tank set (not Tank 8000). The email has nothing to do with Vista's work on Tank 8000 or its work on any of the other slab tanks. Ohl Reply Dec., ¶ 17.

**b.   Premier does not dispute that its replacement subcontractor, M&D, concluded that Vista's engineering work qualified the annular tanks, met the contract specifications and the engineering standard of care.**

M&D admitted that Vista qualified the annular tanks just as M&D did, *i.e.* by meeting the project specifications and engineering standard of care. Vista MSJ SOF, No. 106. Premier does not dispute this conclusion by M&D. Instead, Premier relies on its unsworn expert report of SC Solutions to claim that Vista nevertheless did not meet the contract specifications. Premier Resp. Fact, No. 107.[11] As set forth in Section II(B)(6), *supra*, SC Solutions offers only immaterial opinions and fails to identify the requisite objective basis for its cursory conclusion that MOX did not "approve" Vista's work.

**D.   Premier Does Not Dispute That Its Auditors Verified the Accuracy of Over $1.4 million in Charges on Vista Invoices 32-35.**

Premier does not dispute that its auditors verified the accuracy of Vista's invoices 32-35 to a 96.4% accuracy rate, *i.e.* $1,433,556.07 in charges on invoices 32-35. Thus, Vista is entitled to summary judgment on Premier's defense and counterclaims that are based on Vista's invoicing practices. As Premier now concedes that Premier's auditors confirmed the accuracy of Vista's invoices, Premier is not entitled to collect damages from Vista for the cost of these audits. *See* Doc. 73, ¶¶ 65-70; Fed. R. Civ. P. 56(d).

Premier merely tries to avoid its auditors' opinions by asserting that, while the "audits speaks [sic] to Vista's invoicing practices," the auditors did not opine on whether Vista performed its work in accordance with the Contract specification or in a manner acceptable to MOX. Premier Resp., p. 34. As set forth above and in Vista's MSJ and response briefs, Premier's claims on those bases fail as a matter of law. According to Premier's auditors, Vista's minimum compensatory damages are $1,433,556.07.

---

[11] Premier also cites to the absence of a Certificate of Conformance for Vista's work. As explained in Section II(B)(_), *supra*, the absence of a Certificate of Conformance is a consequence solely of MOX's repeated design changes and requests for out-of-scope analysis. It does not relieve Premier of its payment obligations.

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 30

Even if this Court finds that liability is disputed, it should still be adjudicated pursuant to Fed. R. Civ. P. 56(d), that if Vista establishes liability at trial, its minimum damages are $1,433,556.07.

## III.    CONCLUSION

For these reasons, Vista is entitled to summary judgment on its Complaint and Premier's Counterclaim as to liability and minimum damages of $1.4 million recommended by Premier's auditors.

The only issues left for trial are the total amount of Vista's compensatory damages at or above the $1.4 million and Vista's entitlement to punitive damages against Premier.

DATED this 29th day of July, 2010.

K&L GATES LLP

By _____

Thomas T. Bassett, ISB # 8092
Email: tom.bassett@klgates.com
Gregory F. Wesner, *Pro Hac Vice*
Email: gregory.wesner@klgates.com
Kjirstin J. Graham, *Pro Hac Vice*
Email: kjirstin.graham@klgates.com
Attorneys for Plaintiff
Vista Engineering Technologies, LLC

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 31

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2010, I electronically filed the foregoing **REPLY IN SUPPORT OF VISTA'S MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following:

        Craig G. Adamson - CAdamson@dadlaw.net
        Craig A. Hoggan – Choggan@dadlaw.net
        Joelle S. Kesler – Jkesler@dadlaw.net
        Scott D. Hansen - SHansen@dadlaw.net

Also, I hereby certify that I have served this document to the non-CM/ECF participants as follows and in the manner indicated: N/A

EXECUTED this 29th day of July, 2010, at Spokane, Washington.

        K&L GATES LLP

        By
        Thomas T. Bassett, ISB # 8092
        Email: tom.bassett@klgates.com
        Gregory F. Wesner, *Pro Hac Vice*
        Email: gregory.wesner@klgates.com
        Kjirstin J. Graham, *Pro Hac Vice*
        Email: kjirstin.graham@klgates.com

        Attorneys for Plaintiff
        Vista Engineering Technologies, LLC

        K:\0309288\00003\17141_KJG\17141P210H

REPLY IN SUPPORT OF VISTA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 32